# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

B.H., *a minor, by her parents*,
TREVOR HOLZHUETER, and
JAMIE HOLZHUETER,

                Plaintiffs,

v.

BRANDON KRAUSE, KARI DUAX,
NANCY BELTER, JANE DOE, and
BEAVER DAM UNIFIED SCHOOL
DISTRICT,

                Defendants.

Case No. 22-CV-1027-JPS

## ORDER

## 1. INTRODUCTION

On September 7, 2022, Plaintiff B.H., a minor, by and through her parents, Jamie Holzhueter ("Jamie") and Trevor Holzhueter ("Trevor") initiated this action alleging illegal seizure in violation of B.H.'s Fourth Amendment rights, false imprisonment, negligent infliction of emotional distress ("NIED"), and negligent training and supervision, following an incident in March 2022 wherein B.H. was inadvertently left restrained on a bus for over two and a half hours. *See generally* ECF No. 1. Now before the Court is Defendants Beaver Dam Unified School District (the "District"), Nancy Belter ("Belter"), Jane Doe ("Doe"), Kari Duax ("Duax"), and Brandon Krause's ("Krause") (collectively, the "District Defendants") motion for summary judgment on all causes of action. ECF No. 26.

For the reasons discussed herein, the Court will grant the District Defendants' motion and dismiss the action.

## 2.    FACTUAL BACKGROUND[1]

### 2.1    Overview of the Parties and Relevant Players

During the relevant period, B.H. was a three-year old special needs student in the District's early childhood education program. B.H.'s special needs include delayed speech and limited functional capacities. She began participating in the District's early childhood program in 2021 pursuant to an Individualized Education Plan ("IEP"). During the 2021-2022 school year, B.H. was a student in the Prairie View Elementary School ("Prairie View") early childhood special education program. During this school year, B.H. attended Kids Care childcare ("Kids Care") in the morning and the Prairie View early childhood special education program in the afternoon.

Badger Bus Lines, Inc. ("Badger Bus") is a corporation, the primary business of which is providing bus services to school districts. At all times material to this case, both Mechelle Weber ("Weber") and Rhonda Monemou ("Monemou") were school bus drivers employed by Badger Bus.

The District is an educational school district governmental entity organized under Wisconsin law. At all times material to this case, Krause was employed by the District as the principal of Prairie View; Duax was employed by the District as an early childhood long-term substitute teacher at Prairie View; Belter was employed by the District as an early childhood teaching assistant at Prairie View; and Tracy Martin ("Martin") was employed by the District as a four-year-old kindergarten teacher at Prairie View.

---

[1]The following recitation of facts is drawn from the parties' agreed upon statement of facts, ECF No. 33, with minor, non-substantive edits. Internal citations therein have been omitted for brevity. Neither Plaintiffs nor the District Defendants filed any separate disputed statement of fact.

### 2.2 The Contract Between Badger Bus and the District

On June 8, 2021, Badger Bus and the District entered into a Contract for Transportation Services (the "Contract") providing that Badger Bus would provide pupil transportation services for the District, including that of special education students. The Contract required all buses to be at the school locations "not more than 15 minutes before class starts nor less than 5 minutes before class starts." It further provided that "[a]s per District policy, drivers shall be responsible for loading and unloading students . . . . The District shall cooperate with the Contractor regarding its responsibilities in accordance with District policy." It also provided that "[e]ach driver shall perform pre- and post-trip inspections as provided for in the Wisconsin handbook for School Bus drivers. The driver, after discharging the last passenger of each run, shall conduct a walk-through inspection of the vehicle to ensure that no child is left on the vehicle."

### 2.3 B.H.'s Transport

In early 2022, when Jamie and Trevor would transport B.H. in their own vehicles, they buckled B.H. into a car seat with "a four-point harness with straps built into the car seat," from which she was incapable of unbuckling herself.

During the 2021-2022 school year, Badger Bus would pick B.H. up from Kids Care around noon and transport her to Prairie View. During these occasions, B.H. sat in a car seat with a five-point harness, from which she was incapable of unbuckling herself. At the end of the school day, Jamie or Trevor would pick B.H. up from Prairie View in their own vehicle.

Jamie was aware that Badger Bus was transporting B.H. in a car seat with a five-point harness, from which B.H. was incapable of unbuckling herself, and Jamie did not object to this method of transportation. Even if

B.H. had been transported in a booster seat and buckled with the vehicle's own integrated seat belt, B.H. would be incapable of unbuckling herself.

During the 2021-2022 school year, Weber drove the route that included picking up B.H. and others from Kids Care around noon and transporting them to Prairie View. Although the Contract provides that Badger Bus drivers would be responsible for unloading students, bus drivers instructed District employees that District employees should unbuckle B.H. when the bus arrived at Prairie View. Although Badger Bus had just begun its contract with the District during the 2021-2022 school year, it had been the common practice for the past twenty-nine years for teachers to enter the school buses and remove their students while bus drivers remained seated.

During the 2021-2022 school year, when B.H. was dropped off at Prairie View, there were typically multiple Prairie View teachers who would come onto the bus to remove students. Duax and Belter would retrieve their students from parents or school buses between 12:25 P.M. and 12:30 P.M. to be ready for class at 12:30 P.M. It took approximately five minutes to get everyone off the bus and into the school. The general expectation was that students would be gathered up and heading into the school by 12:30 P.M., but this expectation was flexible, especially for the younger students.

### 2.4    Badger Bus Standard Operating Procedures

Upon their hiring by Badger Bus, both Weber and Monemou received a copy of the Badger Bus Standard Operation Procedures: Training Program (the "SOP"). It provided that, prior to the start of any trip, Badger Bus drivers were required to check the condition of the bus, including its interior cleanliness, which required walking to the back of the bus. The SOP

required without exception that drivers conduct a "post-route/child check" following the completion of each route to ensure that all students had completely exited the bus. This inspection included the expectation that drivers physically walk to the back of the bus to look for students. The SOP also required without exception that drivers conduct a "post trip" physical inspection of the entire inside of the bus immediately upon parking the bus and before leaving the bus. This, too, included the expectation that the driver physically walk to the back of the bus. The SOP called for a "child-check of the entire interior," as well as "attention to ChildMinder alarm," which was not installed on the van-style bus that transported B.H. Neither the Contract nor the SOP required a ChildMinder alarm to be installed in each Badger Bus vehicle.

The SOP also required Badger Bus employees to comply with applicable laws regarding child car seats and required children to be in a car seat "until they reach age 4 and 40 pounds." The SOP assigned drivers the responsibility of complying with car seat securement requirements and provided that "[n]o vehicle will be moved until and unless all passengers are properly and safely secured as applicable, distance and speed notwithstanding." The SOP required drivers to check unoccupied car seats and booster seats prior to moving the vehicle. It also stated that employees were not allowed to "have physical contact with student passengers unless it is determined that appropriate physical contact is required to ensure the safety of the student or students being transported." The SOP specific to special education pre-kindergarten students also required that student passengers be delivered directly to a parent or designated representative when the student was being transported outbound from a school or school activity.

### 2.5   District Practices, Policies, and Procedures

At all times material to this case, there was no law, regulation, or formal District policy that required any District employee to do any of the following: enter the bus and unbuckle students; train or supervise other District employees or Badger Bus employees to enter the bus and unbuckle students; verify a student absence when a student did not get off the bus; train or supervise other District employees to verify a student absence when a student did not get off the bus; or train or supervise Badger Bus drivers to ensure that drivers perform pre-trip and post-trip checks as provided in the SOP.

In practice, during the 2021-2022 school year, District employees unbuckled B.H. after arriving at school on the bus and assisted her in exiting the bus. And for nearly three decades, at the direction of bus drivers, the practice was for District employees to approach and/or enter the bus when it was parked at the school to retrieve their students from the bus, including unbuckling those who were in car seats. This practice involved each teacher/aide only retrieving students from their own classes; if a bus had students from multiple classrooms, the teachers/aides would retrieve only their own students and other teachers/aides would retrieve the others.

### 2.6   The March 9, 2022 Incident

On the morning of March 9, 2022, Jamie drove B.H. in her own vehicle, and in the four-point-harness car seat, to Kids Care. Neither Jamie nor Trevor informed the District that B.H. would be absent from school that day.

Shortly after noon, a Kids Care employee came onto the van-style bus driven by Weber and buckled B.H. into the five-point-harness car seat therein. No District employee was present at Kids Care when B.H. got on

the bus and was buckled in. Weber did not walk to the back of the bus to ensure that each student was buckled prior to driving the bus from Kids Care to Prairie View.

Weber drove the bus to Prairie View and parked it outside the school at approximately 12:20 P.M. At 12:28 P.M., Weber opened the bus door and instructed two of the students on the bus to unbuckle themselves. Martin took two steps into the bus, going no further in than the top step, and had an unrelated conversation with Weber. Two students who were in Martin's class exited the bus with her. After those two students and Martin exited the bus, Weber closed the bus door. By 12:30:35 P.M., the bus was in motion and leaving. Weber did not unbuckle B.H. from her car seat or perform a post-route child check before driving the bus away from its parked position to the street.

On the average day, both Duax and Belter would meet the bus to get their students, although there was no expectation, arrangement, or assignment as to whether they would meet any specific bus on any given day. Sometimes other District staff would help get Duax and Belter's students off the bus if they saw Duax and/or Belter dealing with something else at the time, or if there was a substitute and the substitute did not know the students.

On March 9, 2022, Duax and Belter walked out of Prairie View to retrieve their students from the buses between 12:25 P.M. and 12:30 P.M. Duax and Belter assisted other students getting off other buses before approaching B.H.'s bus. B.H.'s bus left before they could get to it. Approximately two to three minutes elapsed between the time that Duax and Belter first went outside to meet the buses and when B.H.'s bus left. After B.H.'s bus left, Duax assumed there was no one left on the bus and

that B.H. was not on it. Duax did not know whether B.H. would be present or absent from school that day, and Duax had planned to get on B.H.'s bus to remove her. As Belter watched B.H.'s bus drive away, she asked the other teachers outside whether that was, in fact, B.H.'s bus, and the teachers responded affirmatively. Assuming B.H. was not on the bus, Duax returned to school and marked B.H. absent in the attendance system at 12:34 P.M.

B.H.'s absence that day was reported as an "unexcused absence" because her parents had not informed the District that she would be absent. B.H. had one prior unexcused absence on January 27, 2022.

On March 9, 2022, no one from the District contacted Jamie or Trevor regarding B.H.'s absence. No District employee knew that B.H. was restrained on the bus in a car seat that day, nor that she was on the bus at all, until later that afternoon when the bus returned to school. No District employee intended B.H. to remain on the bus during that time, intended to confine or restrain her, or intended for her to be harmed. It was an accident that she was left on the bus.

Following her departure from Prairie View, Weber drove the bus—still with B.H. on it—to Weber's home and parked it on the street at 12:37 P.M. Weber did not perform a post-trip inspection of the bus upon parking it at her home and before exiting the bus. At 1:45 P.M., Weber re-entered the bus and drove it to the Badger Bus terminal parking lot. She parked the bus there at 1:52 P.M., again leaving B.H. on the vehicle. She did not perform a post-trip inspection of the bus upon parking it at the terminal and before exiting the bus. Weber did not intend to harm B.H. or to leave her on the bus. She made a mistake in not completing the post-route checks.

At 2:46 P.M., Monemou entered the bus but did not perform a pre-trip check of the interior cleanliness of the bus or a pre-trip check of the car

seat buckles or latches. She did not notice B.H. on the bus. Monemou drove the bus to a gas station, exited the bus, then returned to the bus and continued driving. She then parked the bus in the parking lot outside of Prairie View.

At 3:00 P.M., Monemou heard a noise and walked to the back of the bus, where she discovered B.H. still in her car seat. B.H. was wearing a winter coat, was not crying, did not appear to be in any distress, and did not show signs of injury. Monemou alerted Badger Bus dispatch, unbuckled B.H. from her car seat, and escorted her off the bus.

After the District was made aware that B.H. had arrived at school, a District employee called Jamie to inform her that B.H. had been left on the bus for the afternoon. At around 3:09 P.M., Duax exited the school, met Monemou and B.H. outside, and then took B.H. inside the school. When Duax encountered B.H., B.H. was not crying, shivering, or exhibiting any signs of distress or injury; rather, she seemed as happy as she typically was. Once inside the school, Belter changed B.H.'s diaper and gave her a snack.

By the time Trevor became aware that B.H. had been left on the bus, B.H. was already safely at home in the care of her parents. Neither Jamie nor Trevor witnessed B.H. on the bus that day, nor were they aware that she had been left on the bus until she was located by Monemou.

When Jamie arrived at Prairie View after being alerted to B.H. being left on the bus, she spoke with Duax, Belter, and Krause about the incident. In that conversation, Jamie was told that no one contacted her about B.H.'s absence because they thought B.H. was out sick.

After Jamie picked B.H. up from school, she picked her son up from high school, then took both children home in her vehicle. That night, Trevor spoke on the phone with Krause regarding the incident.

### 2.7 The Aftermath

On March 10, 2022, Nan Bolker ("Bolker") from Badger Bus called Weber and informed her that she would be suspended from driving routes for a week. In response, Weber told Bolker that she quit. Monemou received no disciplinary action related to the incident.

Also on March 10, 2022, Badger Bus promised the District that it would take the following measures: review the fleet to confirm operation of the electronic child check system; conduct meetings with staff to review and reinforce the requirements of pre- and post-trip checks; send repeated reminders for pre- and post-trip checks; perform random video checks to ensure compliance; and require drivers to radio in as they walk the bus after the route.

B.H. showed no signs of physical injury from the incident. No medical or mental health treatment was sought for her. Jamie and Trevor believe that as a result of the incident, B.H. has been angrier and more aggressive, but there has been no formal diagnosis or medical opinion linking the incident to any changes in observed behavior.

When Jamie was alerted to what happened to B.H., she began "bawling." She could not stop thinking about what had happened, felt she had let B.H. down, and worried that B.H. could have died. She felt as though "the world did not make sense." She experienced physical shaking and nausea and was so upset that she called the police. For the rest of the day on March 9, 2022, and for the next several weeks, her symptoms continued unabated and at times worsened. She had trouble getting to sleep and would repeatedly wake up in the night in cold sweats with images of B.H.'s ordeal in her head. The incident aggravated Jamie's pre-existing anxiety, leading her to discuss the incident and its effects with her doctor,

who in turn increased Jamie's anxiety medication. She has difficulty concentrating on her work and on her daily tasks. To this day, she becomes nauseous, upset, and experiences physical shaking when she thinks about the incident. She is also worried that B.H. suffered ill effects beyond what can be observed. Jamie continues to suffer sleep interruptions when she thinks about the incident.

Jamie now drives B.H. to and from school, losing time in her day that she otherwise would retain, because the incident caused her to lose trust in the school and bus system. Jamie and Trevor also now pay more for B.H.'s education because they are reluctant to allow B.H. to continue to attend school in the District after what happened. They contemplate moving out of the District but have not yet done so. When Jamie and Trevor discuss the incident, it makes them cry.

Trevor initially assumed, upon being alerted to the incident, that B.H. had been harmed. He was so alarmed that he tried to get Jamie to bring B.H. home immediately, even though Jamie had to pick up their other child first. He was so outraged by the incident that he called Krause and yelled at him. Trevor was so scared about what had happened to B.H. and whether she would be physically or mentally harmed by the incident that he began crying, shaking, sweating, and fell to the floor.

His reaction remained largely the same for the following one to two weeks, but even after that point he could not stop thinking about the incident—particularly about how cold it was and how close B.H. might have come to dying. Trevor was plagued with images of B.H. freezing to death on the bus. His anger and sadness interrupted his thought processes, distracted him from daily tasks and interactions, and caused him to occasionally sweat and shake. The anxiety drained him, and he began

feeling more tired and pessimistic about life, fearing that anything could happen and that he and his family were in danger. To this day, Trevor continues to experience episodes wherein he is reminded of the incident and gets angry, sad, shaky, sweaty, and distracted.

Like Jamie, Trevor suffers from pre-existing anxiety. He historically experienced sporadic panic attacks, and these attacks increased significantly after the incident. The panic attacks make his throat feel tight, make him feel as if he cannot breathe, cause him to fixate on the incident and replay it over and over in his head, and cause him to shake and sweat.

Both Trevor and Jamie continue to have trust issues with leaving B.H. in anyone else's care, including at daycare. This makes functioning in their everyday lives more difficult. When they feel they have no choice but to leave B.H. in someone else's care, they feel guilty and anxious.

On March 25, 2022, an IEP meeting was held to revise the placement of services for B.H. from Prairie View in the afternoon to Kids Care all day. During the IEP meeting, Jamie was given an opportunity to express any new concerns, but she did not mention that B.H. had experienced any emotional distress or exhibited any developmental delay as a result of the incident.

On June 6, 2022, B.H. had an initial video assessment with Dr. Daniel Schulteis ("Dr. Schulteis"), a developmental-behavioral pediatrician. During that assessment, Jamie did not express any concerns about any emotional distress B.H. was experiencing. Instead, she told Dr. Schulteis that B.H.'s best trait is that she is "always happy."

After the incident, no changes were made to the way in which teachers and aides received students in the afternoon. However, Prairie View did request an update to the online attendance system to call parents

for unexcused absences during both the morning and afternoon classes. Krause personally verifies this system is working daily. At the time of the incident, the online attendance system only called for morning student absences.

### 3. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255).

Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (collecting cases). But simply "denying a fact that

has evidentiary support 'does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment.'" *Uncommon v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (quoting *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 854 (N.D. Ill. 2015)).

**4.     ANALYSIS**

**4.1     Fourth Amendment Seizure**

**4.1.1     The Parties' General Arguments**

As to Plaintiffs' first cause of action, "Illegal Seizure," Plaintiffs allege that the District and its employees "cause[d] [B.H.] . . . [to] be[] held immobile, on a bus, in below-freezing weather, for nearly 3 hours longer than she should have been" and "unreasonably restrained B.H.'s movement by leaving her in her 5-point harness on [the] bus for three hours." ECF No. 1 at 7.

The District Defendants argue that no Fourth Amendment seizure occurred in this case because "the District Defendants did not restrain B.H. in her car seat nor intend[ed] B.H. to remain on the bus . . . ." ECF No. 27 at 7. Moreover, "[n]o District employee was present when B.H. was buckled into her car seat," "[n]o District employee participated in buckling B.H. into her car seat," and "[n]o District Employee even knew that B.H. had been buckled into her car seat on the bus that day." *Id.* at 8.

In response, Plaintiffs assert that the District Defendants intentionally seized B.H. "because the harm and injury were almost certain to occur as a result of [their] conduct." ECF No. 38 at 2. Plaintiffs argue that "[i]ntent can be found 'where some harm is substantially certain to follow from an act according to common experience.'" *Id.* at 3 (quoting Wis. JI-Civil § 2001). "B.H. was seized by the bus and the harness—'the very instrumentality' the District used to restrain her." *Id.* at 6 (quoting *Brower v.*

*County of Inyo*, 489 U.S. 593, 599 (1989)). Plaintiffs seem to suggest that Duax and Belter intended for B.H. to remain on the bus because they had "no reason to think B.H. would not be on the bus" and "made [no] effort to stop the bus or attract the driver's attention so they could check the bus for their students." *Id.* at 3–4. "[B.H.'s] seizure became unreasonable when the District's actions led to B.H. remaining seized after the permissible purpose had ended." *Id.* at 6.

### 4.1.2   Law and Analysis

The Fourth Amendment prohibits unreasonable seizures by state actors. U.S. CONST. amend. IV (referencing "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures"). The scope of the Fourth Amendment's prohibition against unreasonable seizures extends to the school context. *See generally, e.g., Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1013 (7th Cir. 1995)).

"A person is seized . . . and thus entitled to challenge the government's action under the Fourth Amendment when the [state actor], 'by means of physical force or show of authority,' terminates or restrains his freedom of movement . . . 'through means intentionally applied' . . . ." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991) and *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989)). "Violation of the Fourth Amendment requires an intentional acquisition of physical control." *Brower*, 489 U.S. at 596. "[T]he detention or taking itself must be willful." *Id.* "This is implicit in the word 'seizure,' which can hardly be applied to an unknowing act." *Id.* A seizure may occur when "a person [is] stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599.

Plaintiffs argue that "B.H. was seized by the bus and the harness—'the very instrumentality' the District used to restrain her." ECF No. 38 at 6 (quoting *Brower*, 489 U.S. at 599). But the parties' agreed upon facts do not support the conclusion that it was the District or any of its employees who selected this method of transport for B.H., mandated that B.H. ride the bus, selected this car seat for B.H., or required its use. Rather, the car seat's use as a general matter was required by law, and the parties' agreed upon facts suggest that the responsibility for procuring and installing car seats for riders as necessary fell to Badger Bus. *See* ECF No. 33 at 5 ("The . . . SOP required Badger Bus employees to comply with applicable laws regarding child car seats and required children to be in a car seat 'until they reach age 4 and 40 pounds' . . . . The . . . SOP assigned drivers responsibility for compliance with car seat securement requirements . . . .") (citation omitted); *see also* ECF No. 40 at 5 ("In this case, the District Defendants applied no instrumentality to detain B.H., and Plaintiffs err by falsely stating that 'B.H. was seized by the bus and the harness—the very instrumentality the District used to restrain her,' . . . a statement which is contradicted by the stipulated facts and is supported by no facts of record.") (quoting ECF No. 38 at 6).

Plaintiffs cite to *Leon v. Tillamook County School District*, but that case does not aid them here. No. 3:17-440-PK, 2018 U.S. Dist. LEXIS 79674 (D. Or. May 11, 2018).[2] There, a young special education student was picked up by a school district bus to be transported to her Head Start program. *Id*. at *5. The child was "strapped into a child safety seat on one of the bus seats, from which [she] could not free herself . . . ." *Id*. Importantly, it was the bus

---

[2]This case was at the motion to dismiss stage rather than the summary judgment stage. *Leon*, 2018 U.S. Dist. LEXIS 79674, at *1.

driver who strapped the child into the car seat. *Id.* at *15. The bus driver forgot about the child, failed to drop her off, and parked the bus for repairs, leaving the child alone on the bus. *Id.* at *5.

The court in *Leon* agreed with the plaintiffs that the bus driver's "strapping [the child] into her car seat was a termination of [the child's] freedom of movement through means intentionally applied," therefore constituting a seizure for Fourth Amendment purposes. *Id.* at *15–16. The court went on to conclude, however, that this initial seizure was not unreasonable, and therefore not actionable under the Fourth Amendment, because the child's parents "consented to the seizure" and because "[t]he purpose behind [the] seizure" was "to ensure [the child's] safety during her regular bus ride." *Id.* at *17–18. The *Leon* analysis so far does not aid Plaintiffs—firstly, because in this case it was a non-defendant Kids Care employee who strapped B.H. into her car seat on the bus, and secondly because even if such employee were before the Court as a defendant, and even if such employee were deemed a state actor for Fourth Amendment purposes, that initial seizure would be considered reasonable.

Having concluded that the initial seizure was reasonable, the court in *Leon* continued. "A seizure under the Fourth Amendment that starts out reasonable, however, can become unreasonable based on duration or other circumstances." *Id.* at *18 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Segura v. United States*, 468 U.S. 796, 812 (1984); and *United States v. Song Ja Cha*, 597 F.3d 995, 999–1000 (9th Cir. 2010)). "This is generally a question for the trier of fact." *Id.* at *19 (citing *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1186 (9th Cir. 1995) and *Palladini v. City of Milpitas*, No. C 06-00779 JW, 2009 U.S. Dist. LEXIS 8854, at *4 (N.D. Cal. Feb. 6, 2009)).

The Court does not doubt that, as in *Leon*, any initial seizure that may hypothetically have occurred here later became unreasonable, in part because it was "prolonged beyond the time reasonably required to complete th[e] mission [of the seizure]." *Caballes*, 543 U.S. at 407. But unlike in *Leon*, the individual who strapped the child into the car seat on the bus is neither before this Court nor considered a state actor. And unlike in *Leon*, the individual who drove the bus and then left the child on the bus unsupervised is also not before this Court. In other words, any individual(s) against whom an unreasonable Fourth Amendment seizure could potentially be argued are not at issue here.

Instead, the defendants here before the Court—the District Defendants—played no role in "terminat[ing] or restrain[ing] [B.H.'s] freedom of movement . . . *through means intentionally applied* . . . ." *Brendlin*, 551 U.S. at 254 (citations omitted). It is undisputed that no District employee put B.H. in the car seat, buckled her in, told or required anyone to do so, witnessed her be put in the car seat, knew she was in the car seat that day, intentionally failed to remove her from the car seat, instructed any other person to restrain B.H. in the car seat, or did anything else that would allow a reasonable juror to conclude that any of the District Defendants "willful[ly]" impeded B.H.'s movement in any way. *Brower*, 489 U.S. at 596. It is also undisputed that the District Defendants had no responsibility to ensure that Badger Bus drivers were complying with their own protocols. If anything, the District Defendants' failing to discover B.H. on the bus was "an unknowing act," which cannot amount to a Fourth Amendment seizure. *Id.*

There were only a couple of points on March 9, 2022 at which any District employee had any interaction with or view of the bus at all. And at

each of those points, the District Defendants remained unaware of B.H.'s presence on the bus. Plaintiffs point to Duax and Belter's failure, in the "2-3 minutes" during which time they were outside Prairie View simultaneously with the bus, to remove B.H. therefrom. ECF No. 38 at 4. They also point to Duax and Belter's failure to "stop the bus from leaving" and to afterwards "determine if B.H. had been held home from school that day." *Id*. at 7. But these contentions sound only in negligence, if anything, not in willful restraint of B.H.'s movement.[3] It is undisputed that Weber drove the bus away from Prairie View before either Duax or Belter had reached it to check if they had any students on board. ECF No. 33 at 9. It cannot possibly be that Duax and Belter's failure to chase down the bus to retrieve a child they did not definitively know to be therein constitutes an actionable Fourth Amendment seizure on their part. The parties agree that "[i]t was an accident that B.H. was left on the . . . bus," ECF No. 33 at 10,[4] and put simply, "[a]n accident or negligence cannot form the basis of a Fourth Amendment constitutional violation." *Thomas v. Roberts*, No. 2:09-cv-402, 2014 U.S. Dist. LEXIS 140639, at *11 (N.D. Ind. Oct. 3, 2014) (citing

---

[3]This is a common theme in Plaintiffs' brief in response to the District Defendants' motion to dismiss. *See* ECF No. 38 at 4 ("No District Defendant asserts that they made any effort to stop the bus or attract the driver's attention so they could check the bus for their students."). Plaintiffs repeatedly point to the District Defendants' inactions while characterizing them as "actions." *Id.* at 5.

[4]Plaintiffs' contention that the District Defendants "try to cast the situation as merely accidental" is odd considering that the parties stipulated to that fact for purposes of summary judgment. ECF No. 38 at 3; ECF No. 33 at 10 ("It was an accident that B.H. was left on the van-style bus."). Similarly, Plaintiffs assert that "[s]ummary judgment is 'usually not proper' in a case involving weighing of questions of intent." ECF No. 38 at 3 (quoting *Pfeil v. Rogers*, 747 F.2d 850, 863 (7th Cir. 1983)). This contention, too, makes no sense considering that Plaintiffs have stipulated to the fact that "[n]o District employee intended that B.H. remain on the van-style bus while it drove away from the school." ECF No. 33 at 10.

*Brower*, 489 U.S. at 596); *see also Eberly v. Harnack,* No. 19 CV 06129, 2020 U.S. Dist. LEXIS 211448, at *13 (N.D. Ill. Nov. 12, 2020) (parties' characterization of shooting as "accidental" "refute[d] the basis for a Fourth Amendment claim, because a seizure by definition must be *intentional*") (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998)). For these reasons, Plaintiffs' Fourth Amendment claim fails to the extent it is asserted against any the District Defendants.[5]

### 4.2    State Law Claims

The District Defendants also move for summary judgment on Plaintiffs' false imprisonment, NIED, and negligent training and supervision claims. ECF No. 27 at 12–22.

"A district court has the discretion not to exercise supplemental jurisdiction over pendent state law claims when it dismisses the claims over

---

[5]Having adjudicated the claim on this basis, the Court need not address the District Defendants' alternate argument that they are entitled to qualified immunity. ECF No. 27 at 9.

Similarly, having concluded that no jury could find that any of the individual District Defendants effected a Fourth Amendment violation on B.H., the Court need not address the issue of municipal liability against the District itself. *Thomas v. Neenah Joint Sch. Dist.,* No. 22-2527, 2023 U.S. App. LEXIS 18493, at *5–6 (7th Cir. July 20, 2023) ("[M]unicipalities—such as school districts—are 'person[s]' who may be sued under § 1983 . . . . Municipalities may be sued only for their own violations of federal law, however, and cannot be held vicariously liable for the constitutional torts of their employees.") (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) and *Dean v. Wexford Health Sources, Inc.*, 18 F. 4th 214, 235 (7th Cir. 2021)); *Young v. Dart*, No. 17-cv-1914, 2021 U.S. Dist. LEXIS 154662, at *40 (N.D. Ill. Aug. 17, 2021) ("To prevail on a *Monell* claim, a plaintiff must first establish an underlying constitutional violation.") (citing *Sallenger v. City of Springfield*, 630 F.3d 499, 505 (7th Cir. 2010) ("For reasons we have already explained, the officers' conduct did not violate the Fourth Amendment. Accordingly, because there is no underlying constitutional violation, the City cannot be liable under *Monell*.")).

which it has original jurisdiction . . . ." *Dargis v. Sheahan*, 526 F.3d 981, 990 (7th Cir. 2008) (citing 28 U.S.C. § 1367(c)(3)).

> [T]he district courts should exercise this discretion to relinquish jurisdiction over state law claims that remain after the dismissal of federal claims unless any of the following three circumstances exists: (1) the state law claims may not be refiled because a statute of limitations has expired, (2) substantial judicial resources have been expended on the state claims, or (3) it is clearly apparent how the state claims are to be decided.

*Id.* (citing *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007)).

The parties' briefing is not written with this analysis in mind. Neither party appears to have even contemplated the possibility that the Court could dismiss the sole federal claim and encounter the issue of whether to exercise supplemental jurisdiction over the remaining state claims. It would have been, at a minimum, prudent on Plaintiffs' part to anticipate the issue and head it off. Having failed to do so, the Court presently lacks any information or argument demonstrating that it should exercise its discretion to retain supplemental jurisdiction over the remaining state law claims. Accordingly, the Court will decline to exercise supplemental jurisdiction and will dismiss the state law claims without prejudice. *See Lennon v. City of Carmel*, 865 F.3d 503, 509 (7th Cir. 2017) ("When a district court dismisses an action for lack of jurisdiction, the dismissal must be without prejudice.") (citing *Mains v. Citibank, N.A.*, 852 F.3d 669, 678 (7th Cir. 2017)).

5.    **CONCLUSION**

For the reasons discussed herein, and on the facts jointly agreed upon by the parties, the Court concludes that no reasonable juror could find a Fourth Amendment seizure to have been effected on B.H. by any of the

District Defendants. Accordingly, Plaintiffs' Fourth Amendment claim stands dismissed with prejudice. And because the Court lacks any indication that the exercise of supplemental jurisdiction would be appropriate in this case, the Court will dismiss the remaining state law claims without prejudice.

Accordingly,

**IT IS ORDERED** that Defendants Beaver Dam Unified School District, Nancy Belter, Jane Doe, Kari Duax, and Brandon Krause's motion for summary judgment, ECF No. 26, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff B.H.'s Fourth Amendment claim be and the same is hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that the Court, pursuant to 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over Plaintiff B.H., Jamie Holzhueter, and Trevor Holzhueter's state law claims for false imprisonment, negligent infliction of emotional distress, and negligent training and supervision and such state law claims be and the same are hereby **DISMISSED without prejudice** as to the District Defendants; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED.**

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of September, 2023.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge